1  Jeffrey S. Kerr (to be admitted *pro hac vice*)    Matthew Strugar (State Bar No. 232951)
2  Martina Bernstein (State Bar No. 230505)    PETA Foundation
   PETA Foundation    2898 Rowena Avenue
3  1536 16th Street NW    Los Angeles, CA 90039
   Washington, DC 20036    Tel: 323-739-2701
4  Tel: 202-483-2190    Fax: 202-540-2207
   Fax: 202-540-2207    Matthew-s@petaf.org
5  JeffK@petaf.org
6  MartinaB@petaf.org

7

8                **UNITED STATES DISTRICT COURT FOR THE**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10  Tilikum, Katina, Corky, Kasatka, and Ulises,          Case No.: 11-cv-
    five orcas,
11                                                   |    **Complaint for Declaratory**
12  Plaintiffs,                                      |    **and Injunctive Relief**
                                                     |
13  by their Next Friends, People for the Ethical Treatment of |   **'11 CV 2476 JM   WMC**
    Animals, Inc., Richard "Ric" O'Barry,            |
14  Ingrid N. Visser, Ph.D., Howard Garrett, Samantha Berg, |
15  and Carol Ray,                                   |
                                                     |
16                          v.                        |
                                                     |
17  SeaWorld Parks & Entertainment, Inc. and SeaWorld, |
18  LLC,                                             |
                                                     |
19  Defendants.                                      |
20  _____ |

21

22                        <u>**NATURE OF THE CASE**</u>

23  1.       In this case of first impression, five wild-captured orcas named Tilikum, Katina, Corky,

24  Kasatka, and Ulises (collectively, the "Plaintiffs"), seek a declaration that they are held by the

25  Defendants in violation of Section One of the Thirteenth Amendment to the Constitution of the

26  United States, which prohibits slavery and involuntary servitude. Plaintiffs were forcibly taken

27  from their families and natural habitats, are held captive at SeaWorld San Diego and SeaWorld

28  Orlando, denied everything that is natural to them, subjected to artificial insemination or sperm

collection to breed performers for Defendants' shows, and forced to perform, all for Defendants' profit. As such, Plaintiffs are held in slavery and involuntary servitude.

2.      Plaintiffs also seek an injunction freeing them from Defendants' bondage and placing them in a habitat suited to their individual needs and best interests.

## JURSDICTION AND VENUE

3.      The Court has jurisdiction under 28 U.S.C. § 1331 for all civil actions arising under the Constitution of the United States. Jurisdiction for Plaintiffs' equitable relief is proper pursuant to 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

4.      Venue is proper under 28 U.S.C. § 1391(b) because a Defendant is located in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

5.      Plaintiffs Tilikum and Katina are wild-captured orcas, confined at SeaWorld Orlando, located at 7007 SeaWorld Drive, Orlando, Florida 32821. Plaintiffs Corky, Kasatka and Ulises are wild-captured orcas, confined at SeaWorld San Diego, located at 500 SeaWorld Drive, San Diego, California 92109. Plaintiffs cannot bring this action to seek relief for themselves due to inaccessibility and incapacity.

6.      The Next Friends People for the Ethical Treatment of Animals, Inc. ("PETA"), a not-for-profit corporation, and Richard "Ric" O'Barry, Ingrid Visser, Ph.D, Howard Garrett, Samantha Berg, and Carol Ray, individuals, bring this action on behalf, and as next friends, of Plaintiffs pursuant to Rule 17(b) of the Federal Rules of Civil Procedure because Plaintiffs' rights cannot be effectively vindicated except through appropriate representatives. The Next Friends, and each of them, have a genuine concern for Plaintiffs' well-being and are dedicated to pursuing Plaintiffs' best interests in this litigation.

7.      Upon information and belief, Defendant SeaWorld Parks & Entertainment, Inc. (SWPE) owns and operates SeaWorld Orlando and SeaWorld San Diego. SWPE is the successor in

interest to SeaWorld, Inc. (SW), a corporation that dissolved in 2009. SWPE maintains its corporate headquarters at 9205 Southpark Loop, Suite 400, Orlando, Florida 32819.

8.     Upon information and belief, Defendant SeaWorld, LLC (SWLLC) is a subsidiary of SWPE and, in conjunction with SWPE, operates SeaWorld San Diego. (SWLLC and SWPE together are referred to as the "Defendants"). SWLLC maintains its corporate headquarters at 500 SeaWorld Drive, San Diego, California 92109.

9.     As described herein, at all times relevant hereto, Defendants have:

   a.   restrained and kept Plaintiffs in constant involuntary physical confinement, with no reasonable means to escape and no choice or viable alternative except to perform services for the benefit of the Defendants;

   b.   deprived Plaintiffs of their ability to live in a manner of their choosing and in which they were intended to live in nature; and

   c.   intentionally subjugated Plaintiffs' will, desires, and/or natural drives and needs to the Defendants' own will and whims, including by means of forcing them to perform tricks and procreate for Defendants' profit.

## FACTS

### Orca Society

10.     Plaintiffs are members of the *Orcinus orca* or "killer whale" species, the largest species of the dolphin family. Orcas possess sophisticated learning, problem solving, and communicative abilities. They also possess distinctive cultural traits.

11.     In nature, orcas engage in many complex social, communicative, and cognitive behaviors, including learning-based cooperative hunting strategies and cultural variation among pods and generational transmission of unique cultural traits.

12.     Orcas live in large complex groups with highly differentiated relationships that include long-term bonds, higher-order alliances, and cooperative networks. They form complex societies with dynamic social roles in intricate networks, many with distinctive cultural attributes in vocal, social, feeding, and play behavior.

13.    Orcas teach their young, in the sense that they will deliberately modify their behavior—at their own cost—in order to encourage, punish, provide experience, or set an example.

14.    Orcas are curious, playful, and possess problem-solving ability. For instance, they have overcome a variety of techniques designed to stop them from removing fish from longlines, including the use of unbaited lines as decoys.

15.    Orcas produce dozens of community, clan, and pod-specific call types, and there is evidence that calls evolve over time and in parallel when shared between separate but associating pods. In fact, intra-species variation in orca calls is so pronounced that other marine mammals have learned to tell them apart based on their calls.

16.    Orcas produce three types of sounds: clicks, whistles, and pulsed calls. A mother and her calf share a distinctive call pattern and structure. A pod—consisting of several related mothers and their calves—use similar calls, collectively known as a dialect. Complex and stable over time, dialects are composed of specific numbers and types of discrete, repetitive calls. Calves likely learn their dialects through contact with their mothers and other pod members, maintaining group identity and cohesion. Orcas' transmission of dialects and other learned behaviors from generation to generation is a form of culture. The complex and stable vocal and behavioral cultures of orcas appear to have no parallel outside humans.

17.    For orcas, finding, catching, preparing, and eating food are social events carried out in the context of an array of traditions and rituals. Food items are shared possibly as an ongoing trust-building exercise.

18.    The orca brain is highly developed in the areas related to emotional processing (such as feelings of empathy, guilt, embarrassment, and pain), social cognition (judgment, social knowledge, and consciousness of visceral feelings), theory of mind (self-awareness and self-recognition), and communication.

**Effects of Captivity**

19.    Defendants force Plaintiffs to live in barren concrete tanks in unnatural physical and social conditions. Defendants' confinement of Plaintiffs suppresses Plaintiffs' cultural traditions and deprives them of the ability to make conscious choices and of the environmental enrichment

required to stimulate Plaintiffs mentally and physically for their well-being. As a result, captive orcas, including Plaintiffs, display physiological and behavioral indicators of stress and trauma. Stress derives from many aspects of captivity, including the changes in social groupings and isolation that occur in captivity. Social relationships play a critical role in the lives and well-being of orcas.

20.     Orcas in the wild live long lives, with males living up to sixty years and females living up to ninety years. In contrast, the mean life span in captivity is approximately 8.5 years.

21.     The physical constraints of the artificial enclosures limit exercise and physically harm the orcas. Confinement also impedes social relationships, degrades autonomy, causes boredom, induces frustration, and inhibits the development of natural abilities and the performance of natural behaviors.

22.     Captivity impairs orcas' communication capacities. Confining orcas in barren concrete tanks with acoustically reflective walls is equivalent to a human living captive in a room covered with mirrors on all walls and the floor. The experience is profoundly distressing, with the distress increasing with the length of confinement in these conditions.

23.     Captive orcas, including Plaintiffs, display physiological and behavioral abnormalities indicative of psychological distress and emotional disturbance. These include stereotyped behavior (abnormal repetitive movements like swimming in circles), unresponsiveness, excessive submissiveness, hyper-sexual behavior (towards people or other orcas), self-inflicted physical trauma and mutilation, stress-induced vomiting, compromised immunology, and excessive aggressiveness towards other orcas and humans.

24.     One of the more dramatic forms of aberrant behavior in captive cetaceans is evidenced by their history of killing and seriously injuring humans, other orcas, and themselves. This history is striking considering that, despite researchers observing orcas hunt and feed from within a body's length, both under and above the water's surface, there is not a single verified instance of a human being attacked by an orca in the wild.

25.   Despite the social and ritual nature of orcas' feeding in the wild, Defendants strictly and completely control the volume and type of food Plaintiffs receive. Plaintiffs are fed only dead fish and their food ration is reduced if they do not perform.

26.   In nature, many orcas form stable social relationships based on maternal relatedness and never leave the group into which they are born. These matrilines—a group consisting of an older female, or matriarch, and her male and female offspring—are part of a group of related matrilines known as pods. Up to four family generations will travel together in a pod for the duration of their lives, separating only briefly to engage socially with other orcas, including mating or foraging. Even in one population with a dynamic social organizational structure, offspring will often stay with their mothers for their entire lives.

27.   Adult males whose mothers die will sometimes die soon after or "move in" with their sisters or another older female. Because a male who is not with a female has no social place in these matriarchal social groupings, a close, stable relationship with his mother or sister is vital to a male orca. Indeed, only one permanent separation of any orca, male or female, from his or her matriline has ever been recorded among orcas living in the wild.

## The Infamous Orca Trade

28.   Orcas' intelligence made them a target of hunters in the 1960s, when they realized that there was money to be made in the global orca trade, trapping and selling them to the new "marine entertainment industry."

29.   Orca hunters initially focused on Puget Sound and British Columbia, where Plaintiff Corky was captured. A series of incidents, however, turned public sentiment against the hunters. In 1970, the bodies of three young orcas—their bellies slit, their tails weighed down with anchor chains—washed ashore in the Northwest. Six years later, an assistant to Washington State's governor witnessed a trader hunting orcas with aircraft and seal bombs—small explosive devices used to frighten and corral marine mammals—on SeaWorld's behalf. The state sued the hunter, settling only after he and SeaWorld agreed to let the orcas go and never to hunt them again in Puget Sound.

30.     With Puget Sound and British Columbian waters closed to hunters, they began looking for alternatives. Antarctica was rejected as too logistically difficult. Public sentiment was strongly against orca hunting in Alaska. Finally, they turned their sights to Iceland, where Plaintiffs Tilikum, Katina, Kasatka, and Ulises were captured.

### The Enslavement and Involuntary Servitude of the Plaintiff Orcas

31.     Plaintiffs Tilikum, Katina, Kasatka, Corky, and Ulises were born free and lived in their natural environment until they were captured and torn from their families.

#### Tilikum

32.     Tilikum was taken from his home and family as two-year-old baby off the coast of Iceland in November 1983.

33.     In late 1984, Tilikum was sold to Sealand of the Pacific in Victoria, British Columbia, where he was compelled to perform tricks for tourists eight times a day, seven days a week. At night, he and two other orcas shared a metal-sided tank only twenty-six feet in diameter and twenty feet deep. The metal tank was so small that Tilikum, already over eleven feet long at this young age, repeatedly cut his skin from rubbing against the sides.

34.     In 1992, Defendants' predecessors, hereinafter "SeaWorld" purchased Tilikum. In response to efforts to free him, SeaWorld urged the Icelandic Minister of Fisheries not to permit Tilikum to be returned to Icelandic waters and he remained SeaWorld's captive.

35.     Prior to his transfer to SeaWorld Orlando, Tilikum was isolated in a small tank barely larger than himself. The National Marine Fisheries Service sharply criticized SeaWorld for failing to take "such reasonable and prudent precautionary steps necessary for the health and welfare of Tilikum" as building him a larger tank or temporarily transferring him to another facility.

36.     From 1993 to the present, Tilikum has been forced to perform tricks on command for visitors to SeaWorld Orlando.

37.     At SeaWorld Orlando Tilikum is confined to barren concrete tanks with an average approximate size of eighty-six feet by fifty-one feet: the equivalent of a six-foot-tall man living on half of a volleyball court. The entire Shamu Stadium complex—including the performance

tank and the holding tanks for seven orcas—holds 7 million gallons of water. However, the minimum volume of water traversed by an orca pod in an average twenty-four-hour period is 45.3 *billion* gallons of water—or *6400 times* the volume of water at Shamu Stadium. And, at SeaWorld Orlando, most of Tilikum's time is spent in a considerably smaller area: in the performance tank (approximately 1/10,000th the minimum volume of water traversed in nature), or in a holding tank (approximately 1/100,000th the minimum volume). On information and belief, orcas at SeaWorld San Diego are held in tanks roughly the size of those at SeaWorld Orlando.

38.    In nature, orcas are typically always in motion, even when resting. One of the fastest animals in the sea, orcas travel up to 100 miles each day and typically spend eighty- to ninety-percent of the time under the water's surface: a near impossibility at SeaWorld Orlando, where only two of the seven tanks are as deep as Tilikum is long.

39.    Tilikum has been forced into captive group structures with at least 27 orcas captured from multiple countries, or born captive in multiple locations who enter and leave SeaWorld Orlando when they are purchased from or transferred to other confinements or die. Such confinement with incompatible and unknown orcas deprives Tilikum of any semblance of the stable, nurturing social family and pod structure from which he was taken.

40.    The constant stress of living in artificial social groupings in such close quarters has led to frequent displays of aggression, in which Tilikum has been cut, rammed, and raked by other orcas. Orcas rake—that is, forcefully tear and scratch the skin of other orcas with their teeth—as a display of dominance  or in failed bite attempts.

41.    In nature, aggression between members of a pod, or between pods in the same resident clan or community—the highest level of the orca social structure—is virtually unknown. Because social group composition is dynamic and fluid with individuals exerting choice about their associations, conflict is resolved through dispersion and shifting alliances within large groups of orcas (giving each other space), an opportunity not afforded by captivity. In Defendants' captivity, however, Plaintiffs cannot affect their social grouping as they are limited by the groups, tanks, and facilities to which Defendants confine them. The animals within these

groups often share no ancestral, cultural, or communication similarities. However, the extreme confinement inflicted on Tilikum and the other Plaintiffs by Defendants' eviscerates the orcas' agency (the ability to act on authentic desires and motivations) due to severely constricted physical boundaries and constant behavioral manipulations leveraged by food or approval, all in the absence of cultural guidance or context, and leads to chronic frustrations and overwhelms cultural prohibitions against violence. Orcas who would not associate in the wild are forced to do so, sparking aggression.

42.     Tilikum's distress from these attacks and confinement with incompatible orcas frequently causes him to swim in rapid circles and slam his head into the side of the tank; or he "surface rests" with wide eyes and an arched posture (consistent with preparation to flee), making loud distress vocalizations and avoiding contact with other orcas.

43.     Tilikum persistently snaps and gnaws at the steel gates between enclosures from aggression caused by these incompatible social groupings or boredom from insufficient physical and mental stimulation. This has broken his teeth, leaving the pulp exposed and producing chronic pain. Tilikum no longer has teeth on his bottom jaw.

44.      In February 2010, Tilikum drowned a trainer following a performance at SeaWorld Orlando. For the next year, now nearly twenty-three feet long, Tilikum was placed in complete isolation, often confined to a concrete tank measuring just thirty-six feet by twenty-five feet.

45.     Tilikum is also forced to provide his sperm so Defendants can breed more performers for their shows. He is conditioned to roll over and present his penis to trainers who masturbate him repeatedly to collect his semen. Because U.S. laws make it virtually impossible for Defendants to import wild-captured orcas, they rely on Tilikum to produce new performers. Indeed, Tilikum is Defendants' most valuable animal, his sperm having been used to produce some two-thirds of all orcas born at the parks  through controlled mating and artificial insemination.

46.     Deprived of liberty, forced to live in grotesquely unnatural conditions and perform tricks, manipulated to give his sperm, and prevented from satisfying his basic drives and from engaging in virtually all natural behaviors, Tilikum has been subjected to extreme physiological and

mental stress and suffering while, at the same time, Defendants and their predecessors have reaped millions of dollars in profits from Tilikum's slavery and involuntary servitude.

Katina and Kasatka

47.     In October 1978, two-year-old baby Plaintiff Katina and her one-year-old podmate, Plaintiff Kasatka, were captured by orca hunters off the coast of Iceland. They were sold to SeaWorld in 1979 and sent to SeaWorld San Diego.

48.     Between 1982 to September 1984, Katina and Kasatka were continuously shipped back and forth between San Diego and Aurora, Ohio—2,048 miles—to perform at SeaWorld Ohio during the summer and at SeaWorld San Diego in the winter.

49.     In the fall of 1984, the two were separated when Katina was transferred to SeaWorld Orlando where she remains confined today.

50.     Katina was forced to breed when only nine years old, far younger than orcas breed in the wild, and her first calf, Kalina, was born in 1985 at SeaWorld Orlando. Since then, Katina has been used as a virtual breeding-machine, delivering six additional calves and being inbred with one of her sons.

51.     In November 2006, both of Katina's sons were taken from her and sent to other facilities.

52.     Like Tilikum, several of Katina's teeth are missing as a result of her frustrated chewing on the tank gates.

53.     In October 1987, Kasatka was shipped to SeaWorld Orlando, then sent to SeaWorld San Antonio, and finally to SeaWorld San Diego, where she has been confined since 1990. She has been forced to breed, including by artificial insemination, and one of her offspring has been taken from her.

54.     For more than three decades, Kasatka has performed unnatural tricks at SeaWorld, sometimes in as many as eight shows a day. According to Defendants, "[s]he's been one of our strongest, most consistent performers."

55.     Deprived of liberty, forced to live in grotesquely unnatural conditions and perform tricks, and prevented from satisfying their basic drives and from engaging in virtually all natural behaviors, Katina and Kasatka have been subjected to extreme physiological and mental stress

and suffering while, at the same time, Defendants and their predecessors have reaped millions of dollars in profits from their slavery and involuntary servitude.

Corky

56.     Corky was seized from her pod—known as the A5 pod—off of Vancouver, British Columbia in 1969 as a three-year-old baby. Corky has endured the longest captivity of any wild-captured orca, enslaved for more than 40 years.

57.     In 1970, Corky was sold to Marineland of the Pacific in Los Angeles County, California. In December 1986, SeaWorld purchased Marineland of the Pacific, and, in January 1987, Corky was transferred to SeaWorld San Diego, where she remains captive today.

58.     Bred seven times, including six times incestuously with a cousin, none of Corky's calves survived more than 46 days. This incestuous breeding is likely a result of the orcas being confined to small areas in which they are unable to select their mating partners from a diverse gene pool. She was continuously pregnant for almost ten years from 1977 to 1986. Her last aborted fetus at Marineland was found at the bottom of her holding tank.

59.     Despite these deaths, SeaWorld attempted to breed her and, in August 1998, Corky miscarried her seventh and final calf at SeaWorld San Diego.

60.     Corky is reportedly blind in her left eye and her upper and lower teeth are worn and decayed. In 1989, she was attacked by another orca at the San Diego park. The collision between the multi-ton animals was so violent that Corky's attacker fractured her upper jaw, causing fatal hemorrhaging.

61.     The A5 pod survives in the waters of British Columbia with eleven members. Of the pod's original eighteen members, seven were captured in 1968, all of whom are now dead. Of the six captured in 1969, Corky alone survives.

62.     Deprived of liberty, forced to live in grotesquely unnatural conditions, perform tricks, and breed repeatedly with close relatives, and prevented from satisfying her basic drives and from engaging in virtually all natural behaviors, Corky has been subjected to extreme physiological and mental stress and suffering while, at the same time, Defendants and their

predecessors have reaped millions of dollars in profits from Corky's slavery and involuntary servitude.

Ulises

63.     Ulises was a three-year-old baby when he was seized off the coast of Iceland in November 1980.

64.     From 1980-1993, he was confined at facilities in Spain, never living with another orca during this time.

65.     In January 1994, Ulises was sent to SeaWorld San Diego where he's been held captive since, subjected to bullying and injuries by incompatible orcas.

66.     Deprived of liberty, forced to live in grotesquely unnatural conditions and perform tricks, harvested for sperm, and prevented from satisfying his basic drives and from engaging in virtually all natural behaviors, Ulises has been subjected to extreme physiological and mental stress and suffering while, at the same time, Defendants and their predecessors have reaped millions of dollars in profits from Ulises's slavery and involuntary servitude.

**Next Friends**

PETA

67.     Next Friend PETA is a not-for-profit corporation organized under the laws of the Commonwealth of Virginia with offices in Los Angeles, California. Founded in 1980, PETA is the largest animal rights organization in the world and operates, in part, under the principle that animals are not ours to use for entertainment.

68.     Since its inception, PETA has championed ending the use of wild-captured animals for human amusement, including the use of marine mammals in aquatic-theme amusement parks, including SeaWorld.

Richard "Ric" O'Barry

69.     Next Friend Richard "Ric" O'Barry, one of the first orca and dolphin trainers, has advocated for the release of captive cetaceans for more than forty years. Mr. O'Barry's extensive experience with captive cetaceans has convinced him that taking the animals out of their natural

habitats and forcing them to perform tricks is detrimental to their physical and psychological well-being.

70.     Mr. O'Barry has been a tireless advocate for the release or retirement of orcas in captivity, including frequently speaking out about Defendants' treatment of captive cetaceans.

71.     Mr. O'Barry has written protocols for the rehabilitation and release of captive cetaceans, including instruction on assessing whether an animal is a candidate for release to his or her native habitat or retirement to a sea pen or natural sea lagoon, based on factors such as the animal's health and condition, ability to catch prey, and defensive skills. The protocols also detail the steps and personnel necessary for a rehabilitation-and-release program, including tracking and monitoring after release.

72.     In 1970, Mr. O'Barry founded the Dolphin Project, an organization that aims to free captive dolphins and to educate people throughout the world about the plight of dolphins in captivity. He has rescued and released more than twenty-five captive dolphins in Haiti, Colombia, Guatemala, Nicaragua, Brazil, the Bahamas, and the United States.

73.     To recognize his contributions, in 1991, Mr. O'Barry received the Environmental Achievement Award presented by the United States Committee for the United Nations Environmental Program (US/UNEP). He is also a Fellow National in The Explorers Club, a multidisciplinary society that connects scientists and explorers from all over the world.

74.     Mr. O'Barry's quest to document the dolphin-slaughtering operations in Taiji, Wakayama, Japan was the subject of the 2010 Academy-Award-winning feature documentary, *The Cove*.

75.     Mr. O'Barry has also authored three books: *Behind the Dolphin Smile*, in 1989; *To Free A Dolphin*, in 2000; and *Die Bucht*, a German-published book about dolphins and the making of *The Cove*, as well as numerous articles about marine mammals in captivity.

<u>Ingrid N. Visser, Ph.D.</u>

76.     Next Friend Ingrid N. Visser, Ph.D., is a leading orca expert with extensive experience in applied orca research, holding a doctorate in Environmental and Marine Science and bachelors and masters of science degrees in zoology. She founded the Orca Research Trust and the Adopt

an Orca project to raise public awareness about orcas in the wild. Dr. Visser is an advocate for ending orca captivity and has spoken out against the treatment of captive orcas.

77.     For twenty years, Dr. Visser has studied orcas in the South Pacific, and her research in New Zealand was instrumental in the New Zealand government's classification of New Zealand orcas as "Nationally Critical"—akin to being listed as "endangered" in the U.S.

78.     Dr. Visser also compiled the first Antarctic orca identification catalogue, conducted the first study of orcas in Papua New Guinea, and is a founder of Punta Norte Orca Research, a non-profit international organization to study and educate the public about the unique population of orcas in Argentina, including their distribution, foraging techniques, and environment. Dr. Visser is also a member of the Society for Marine Mammalogy.

79.     Dr. Visser has contributed to other orca research projects in Washington State, Alaska, British Columbia, and Russia through photo-identification, behavioral observations, and photographic work.

80.     In Iceland in 2000 and 2001, she assisted in preparing Keiko (known from the movie *Free Willy*) for reintroduction into the wild, including photo-identification, acoustic recording, behavioral observations and video recording, helicopter and boat surveys, satellite tracking, biopsy sampling, feeding, and basic husbandry.

81.     Dr. Visser also has extensive experience with cetacean rescue, rehabilitation, and husbandry, including co-founding and serving as coordinator for Whale Rescue, a non-profit organization established to assist with rescuing stranded and entangled cetaceans, and serving as an instructor and committee member for Project Jonah, the largest and most successful whale and dolphin rescue organization in the southern hemisphere. Dr. Visser has participated in more than thirty rescues of stranded whales and dolphins, involving up to 150 animals.

82.     Since 1998, Dr. Visser has published more than thirty-five peer-reviewed scientific manuscripts as senior and co-author, conference proceedings, and reports, including her dissertation, *Orca* (Orcinus orca) *in New Zealand waters*, and a report on the welfare issues of rehabilitating and rereleasing a previously-stranded and now captive orca and the feasibility of rehabilitating and rereleasing her to the wild.

<u>Howard Garrett</u>

83.     Next Friend Howard Garrett has educated the public and advocated on behalf of orcas and other marine mammals for thirty years, including advocating for the release of captive orcas.

84.     In 2001, Mr. Garrett co-founded the Orca Network, a Washington State-based non-profit organization, to raise awareness of the orcas of the Pacific Northwest and the importance of providing them healthy and safe habitats.

85.     The projects of the Orca Network include the Whale Sighting Network and Education Project, through which sightings and observations of the orca community are gathered and disseminated to researchers and volunteers. The purpose is to encourage shoreline observation and increase awareness and knowledge about the Southern Resident Community of orcas and to foster a stewardship ethic and motivate a diverse audience to take action to protect and restore the habitat.

86.     Mr. Garrett's Orca Network is also a member of Central Puget Sound Marine Mammal Stranding Network, part of the regional stranding network established by the National Oceanographic and Atmospheric Administration under the Marine Mammal Protection Act.

87.     Mr. Garrett is a frequent lecturer and presenter to service groups, environmental organizations, state parks, and schools on the history of orca research, orca captures, current captivity issues, and orca natural history, with an emphasis on orca cultures and communications, and the implications of our expanding knowledge of orca intelligence and cultural capabilities.

88.     Before founding the Orca Network, Mr. Garrett was a field researcher for the Center for Whale Research, an organization that has gathered unprecedented information on the population, social structure, and individual life histories of the Southern Resident orca population through photo-identification studies in the inland waters of Washington State and lower British Columbia. Mr. Garrett photographed orcas to document presence, location, behavior, and association patterns, as well as creating acoustic recordings of call repertoires.

89.     Mr. Garrett also served as editor of *Cetus*, the journal of the Whale Museum, editing research articles with an emphasis on the natural history of orcas.

90.     Mr. Garrett is a member of the Society for Marine Mammalogy and Northwest Aquatic and Marine Educators Association and has published work on, among other topics, the cultural communities of orcas and the history, biology, and logistics of releasing long term captive orcas.

<u>Samantha Berg</u>

91.     Next Friend Samantha Berg was employed at SeaWorld Orlando, where she worked with captive orcas from August 1991 to August 1992 and with beluga whales, false killer whales, pacific white-sided dolphins, and bottle-nosed dolphins from February 1990 to August 1991.

92.     As an associate orca trainer, Ms. Berg regularly and directly interacted with Plaintiffs Tilikum and Katina, conducting training exercises in the water, performing out-of-the-water "dry work," or acting as a spotter during the orca shows. Ms. Berg was not permitted to conduct direct training with Plaintiff Tilikum due to his known aggression toward humans.

93.     During her employment at SeaWorld Orlando, Ms. Berg witnessed orcas regularly develop ulcers and suffer from infections due to the stress caused by captivity.

94.     As part of her job responsibilities, Ms. Berg narrated so-called "educational" shows for school children and others visiting SeaWorld Orlando, in which she was required to provide false information, including, *inter alia*, misleading information about the lifespan of orcas held in captivity versus those living in their natural habitats.

95.     Since leaving SeaWorld Orlando, Ms. Berg has regularly spoken out as an advocate against keeping orcas in captivity.

<u>Carol Ray</u>

96.     Next Friend Carol Ray was employed at SeaWorld Orlando from 1987 to 1990, and, for over two years, worked with Defendants' captive orcas. As an orca trainer, Ms. Ray regularly interacted with Plaintiff Katina and five other orcas who have since died, including two of Katina's offspring.

97.     Ms. Ray prepared the orcas' food, cleaned the feeding buckets, and performed other routine tasks. Eventually, she worked extensively with Plaintiff Katina and her daughter Kalina, including conducting training exercises and performances in the water, performing out-of-the-water "dry work," and acting as a spotter during the orca shows.

98.     During her time as an orca trainer, Ms. Ray complained to supervisors and management personnel about the harm resulting from disrupting the orcas' social structure by taking Kalina from her mother and siblings at a young age and moving Kalina to another facility. These concerns were dismissed out of hand and mocked, and Ms. Ray was removed from working directly with animals—a common management reaction when trainers complained about SeaWorld's' procedures.

99.     The night Kalina was taken from Plaintiff Katina, Ms. Ray observed Katina expressing her grief by vocalizing loudly for hours as she stayed floating in one spot, alone in her tank.

100.    Since leaving SeaWorld Orlando, Ms. Ray has regularly spoken out as an advocate against keeping orcas in captivity.

## First Claim for Relief

## Thirteenth Amendment: Slavery

101.    Plaintiffs hereby restate and reallege each of the foregoing paragraphs as if fully set forth herein.

102.    Section One of the Thirteenth Amendment of the United States Constitution provides, in pertinent part, "[n]either slavery nor involuntary servitude… shall exist within the United States, or any place subject to their jurisdiction." U.S. CONST. amend. XIII, § 1.

103.    Section One of the Thirteenth Amendment is self-executing, abolishing slavery and involuntary servitude without any ancillary legislation.

104.    Section One of the Thirteenth Amendment prohibits the conditions of slavery and involuntary servitude without regard to the identity of the victim and without reference to "persons."

105.    Although enacted in the historical context of African slavery, the Supreme Court has repeatedly declared that the Thirteenth Amendment is not so limited. Because the Amendment forbids any form of slavery, it embodies a principle that can be (and over the years has been) defined and expanded by common law to address morally unjust conditions of bondage and forced service existing anywhere in the United States.

106.    Moreover, our Constitutional jurisprudence is the story of the courts interpreting, applying, and expanding Constitutional protections to new groups and circumstances. A constitutional "principle, to be vital, must be capable of wider application than the mischief which gave it birth." *Weems v. United States*, 217 U.S. 349, 373-74 (1910).

107.    As described herein, Defendants are holding Plaintiffs in slavery in violation of Section One of the Thirteenth Amendment by, among other things:

    a.   holding Plaintiffs physically and psychologically captive to the Defendants' demands and compelling Plaintiffs to serve the Defendants;

    b.   keeping them by physical means and other coercion with no means to escape and no choice or viable alternative except to perform services for the Defendants;

    c.   keeping them separated from their homes and families;

    d.   depriving them of the ability to engage in natural behaviors and determine their own course of action or way of life;

    e.   exploiting their special vulnerabilities;

    f.   intentionally subjugating the will, desires, and/or innate drives and natural instincts of Plaintiffs to the Defendants' will and whims;

    g.   keeping Plaintiffs continually and constantly confined in unnatural, stressful and inadequate conditions; and

    h.   forcing Plaintiffs to subject themselves to artificial insemination or sperm collection for the purposes of involuntary breeding.

**Second Claim for Relief**

**Thirteenth Amendment: Involuntary Servitude**

108.    Plaintiffs hereby restate and reallege each of the foregoing paragraphs as if fully set forth herein.

109.    Section One of the Thirteenth Amendment also abolishes "involuntary servitude," a term with a broader meaning than slavery, abolishing any state of bondage in this country, of whatever name or form.

110.    While the outer limits of the common law prohibition against "involuntary servitude" are not currently established, at a minimum, and as used in this case, it involves the rights to one's own life and liberty, to labor for one's own benefit, and to be free from physical subjugation or coercion by another.

111.    As described herein, Defendants have subjected Plaintiffs to conditions repugnant to the Thirteenth Amendment's prohibition against involuntary servitude.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

1

## PRAYER FOR RELIEF

2   WHEREFORE, based on the foregoing, Plaintiffs respectfully pray that this Honorable Court:

3   (a)     Declare Plaintiffs to be held in slavery and/or involuntary servitude by Defendants in

4   violation of the Thirteenth Amendment to the United States Constitution;

5   (b)     Permanently enjoin Defendants from holding Plaintiffs in slavery and/or involuntary

6   servitude and order Defendants to release Plaintiffs from bondage;

7   (c)     Appoint a legal guardian to effectuate Plaintiffs' transfer from Defendants' facilities to a

8   suitable habitat in accordance with each Plaintiff's individual needs and best interests;

9   (d)     Award reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1595; and

10  (e)     Such other relief as this Court deems fair and appropriate.

11

12                                          Respectfully submitted,

13                                          s/Matthew Strugar
                                            Matthew Strugar (State Bar No. 232951)
14                                          Matthew-s@petaf.org
                                            PETA Foundation
15                                          2898 Rowena Avenue
                                            Los Angeles, CA 90039
16                                          Tel: 323-739-2701
                                            Fax: 202-540-2207
17

18

19                                          Jeffrey S. Kerr (to be admitted *pro hac vice*)
                                            JeffK@petaf.org
20                                          Martina Bernstein (State Bar No. 230505)
                                            MartinaB@petaf.org
21                                          PETA Foundation
                                            1536 16th Street NW
22                                          Washington, DC 20036
                                            Tel: 202-483-2190
23                                          Fax: 202-540-2207
24

25                                          Attorneys for Plaintiffs

26  October 26, 2011

27

28

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
20

☙JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Tilikum, Katina, Corky, Kasatka, and Ulises, five orcas, by their Next Friends, People for the Ethical Treatment of Animals, Inc., (see attachment for additional next friends) | SeaWorld Parks & Entertainment, Inc. and SeaWorld, LLC, |

**(b)** County of Residence of First Listed Plaintiff  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Matthew Strugar, PETA Foundation, 2898 Rowena Avenue, Los Angeles, CA 90039; Tel: 323-739-2701 (see attachment)

Attorneys (If Known)

'11CV2476 JM   WMC

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 2201; Thirteenth Amendment
Brief description of cause:
Suit seeking junctive and declaratory relief under 13th Amendment for five captive orcas

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE                          DOCKET NUMBER

DATE                          SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

**Attachment to Civil Cover Sheet**

<u>Additional Next Friend Information</u>:

Richard "Ric" O'Barry, Ingrid N. Visser, Ph.D., Howard Garrett, Samantha Berg, and Carol Ray.

<u>Additional Attorneys Information</u>:

Jeffrey S. Kerr (to be admitted *pro hac vice*)
Martina Bernstein (State Bar No. 230505)
PETA Foundation
1536 16th Street NW
Washington, DC 20036
Tel: 202-483-2190
Fax: 202-540-2207
JeffK@petaf.org
MartinaB@petaf.org